UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

JIANJIA XIE,

Plaintiff,

-against-

RAY CHEN a/k/a RAYMOND CHEN,

Defendant.

----------------------------------------------------------------------X

Case No.:

**COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Jianjia Xie ("Xie" or "Plaintiff"), by her attorneys, Certilman Balin Adler & Hyman, LLP, as and for her Verified Complaint against defendant Ray Chen a/k/a Raymond Chen ("Chen" or "Defendant"), alleges as follows:

## PRELIMINARY STATEMENT

1. This action involves Defendant's theft and misappropriation $350,000.00 from Plaintiff (the "Payment") in connection with a purported "Share Sale Agreement", signed by Plaintiff and Defendant, dated April 21, 2021 (the "Agreement"). A copy of the Agreement is annexed hereto as **Exhibit 1**.

2. In short, Defendant fraudulently induced Plaintiff into signing the Agreement, by deceiving Plaintiff into believing she was making a legitimate investment in a Special Purpose Acquisition Company, or SPAC, named "Newbridge Acquisition Limited" ("Newbridge") by purchasing shares in Newbridge from Goldenbridge Capital Management LLC ("GCM").

3. After Plaintiff and Defendant signed the Agreement, Plaintiff transferred $350,000.00 to a bank account exclusively owned and/or controlled by Defendant (the "Payment"), believing that this money was being sent to GCM to purchase shares as outlined in the Agreement.

4. However, Defendant never provided Plaintiff with the required documentation pursuant to the Agreement that would support the legitimacy of the transaction set forth in the Agreement. Instead, Plaintiff's repeated requests, both personally and through counsel, were met almost entirely with silence.

5. The only information that Plaintiff was able to learn from Defendant following the Agreement's execution, and after the Payment was made, was that the Payment was never used for an investment in Newbridge as required by the Agreement.

6. Upon information and belief, neither Newbridge nor GCM ever existed, and the Payment was never actually used to purchase shares by a non-existent entity (GCM) in a non-existent SPAC (Newbridge).

7. Instead, Plaintiff learned that Defendant simply misappropriated the Payment for his own benefit, providing no consideration to Plaintiff whatsoever in exchange therefor.

8. Defendant has given Plaintiff no choice but to commence this action to, once and for all, shed light on Defendant's misdeeds, and to recover the damages sustained by Plaintiff as a result of Defendant's false and fraudulent scheme.

## **PARTIES**

9. Plaintiff Jianjia Xie is an individual who is a citizen of the People's Republic of China and resides in Shanghai, China.

10. Defendant Ray Chen a/k/a Raymond Chen is an individual who, upon information and belief, currently resides in the State of Connecticut, and has an address at 1287 Rock Rimmon Road, Stamford, Connecticut, 06903.

## **JURISDICTION AND VENUE**

11. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), in that this action

involves a controversy which is wholly between Plaintiff, a citizen of China, and Defendant, a citizen of the State of Connecticut, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12. Venue is proper in this District, pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events or omissions giving rise to the claims occurred in this District.

13. Among other things, the Agreement required Plaintiff to make the Payment to a bank account at Bank of America, 550 Fifth Avenue, New York, 10022. This bank account purportedly belonged to GCM. Plaintiff has since learned that the bank account to which the Payment was made was owned and/or controlled exclusively by Defendant personally as, *inter alia*, GCM does not exist.

14. At the time of the Payment and at times prior thereto, Defendant was a resident of the County of New York, State of New York.

## FACTUAL BACKGROUND

### Plaintiff and Defendant Begin Discussing the Purported SPAC

15. Plaintiff originally met Defendant at a social event in 2018, and understood him at the time to be a film producer.

16. Plaintiff and Defendant thereafter maintained and continued a friendship for several years, both in-person and over text.

17. In late 2020, Plaintiff texted Defendant to ask whether he knew about several SPACs that her friend had recommended.

18. Defendant replied that he previously worked on a SPAC with a ticker symbol SJ, which went public via initial public offering ("IPO") in January 2020 and allowed investors to cash out after eight months.

19. Through their continued conversations, Defendant represented to Plaintiff that he was an established investor in various entities, including SPACs.

20. Plaintiff, who is not a sophisticated investor and who, by virtue of her status as a Chinese citizen, has limited knowledge of New York or United States laws, customs, or business practices with respect to SPACs or similar investments, relied on the representations and alleged knowledge of Defendant, with whom Plaintiff had a friendship and who is an individual of a similar cultural background.

21. On March 3, 2021, Defendant texted Plaintiff two pictures concerning an IPO of Goldenbridge Acquisition Limited, listed on Nasdaq as GBRG, and asked Plaintiff if she wanted to invest in Defendant's next SPAC project.

22. A Renaissance Capital article[1] dated September 8, 2020 describes Defendant as the COO of GBRG, and describes him as "former CEO of Fortissimo Film International." The article further states that Defendant "previously held the same role[] for Wealthbridge Acquisition, which went public in February 2019 and merged with live entertainment mobile streaming company Scienjoy (SJ)…in May 2020."

23. On March 6, 2021, Defendant texted Plaintiff that a SPAC he was involved in, later identified as Newbridge, was very profitable and was expected to have an IPO within six (6) months.

24. Also in the March 6, 2021 text exchange, Defendant told Plaintiff that, if she wanted to invest, she would get her initial investment back plus 50% profit in a year and a half.

25. Prior to the execution of the Agreement, Defendant also represented to Plaintiff, both directly and via communications with Plaintiff's ex-husband Nicholas Pechet ("Pechet"),

[1] https://www.renaissancecapital.com/IPO-Center/News/70915/artificial-intelligence-spac-goldenbridge-acquisition-files-for-a-50

both by phone and text, that the Ant Group, one of China's largest fintech and digital services conglomerates that is closely associated with Alibaba, would be investing in the SPAC that was to be the subject of the Agreement.

26. Defendant's intent by his false representation regarding the Ant Group's involvement in the subject SPAC was to give credibility to his scheme, and to entice Plaintiff to "invest" $350,000.00 with Defendant.

27. Defendant also exchanged a litany of emails with Plaintiff between March 30, 2021 up until the Agreement was signed on April 21, 2021, in which Defendant repeated the aforementioned statements regarding, among other things the character of the SPAC and the SPAC's existence, the Ant Group's involvement, and other details regarding the purported investment that Defendant fraudulently induced Plaintiff to make. A copy of some of the aforementioned emails are annexed hereto as **Exhibit 2**.

28. For example, in a single email dated April 3, 2021 Defendant emailed Plaintiff regarding director and officer (D&O) insurance protection, sponsor capital being invested into the SPAC, the Ant Group's involvement, CFIUS[2] concerns surrounding the Ant Group's purported involvement in the fictional SPAC, and concerns regarding the Agreement.

29. All of Defendant's aforementioned statements to Plaintiff from March 6, 2021 to April 21, 2021 (the "Pre-Agreement Fraudulent Statements") were entirely false and Defendant knew them to be false. There was no SPAC and no investment opportunity, the Ant Group was not involved with the fictional SPAC, and all of the other purported details Defendant represented to Plaintiff regarding the "opportunity" were completely fictional.

30. The Pre-Agreement Fraudulent Statements were calculated by Defendant to

[2] Committee on Foreign Investment in the United States.

intentionally misappropriate Plaintiff's money and to provide Plaintiff with nothing in return.

31. Plaintiff, believing Defendant to be an established, well-known investor, including in SPACs, reasonably relied on the Pre-Agreement Fraudulent Statements to her detriment.

**Plaintiff Signs the Sham Agreement**

32. Plaintiff and Defendant both signed the Agreement dated April 21, 2021.

33. The subject of the Agreement was the purchase by Plaintiff of 116,667 shares in a SPAC "incorporated in the State of Delaware" named Newbridge. *See* Ex. 1 at pp. 1, 3.

34. However, Newbridge is a fictional entity that does not exist in the State of Delaware, and was contrived by Defendant to lend credibility to the sham Agreement.

35. There are several entities incorporated in the State of Delaware whose names begin with "Newbridge Acquisition", such as Newbridge Acquisition Corporation, Newbridge Acquisition Holdings LLC, Newbridge Acquisition I, LLC, Newbridge Acquisition II, LLC, Newbridge Acquisition III, LLC, and Newbridge Acquisition IV, LLC.

36. Defendant apparently chose a name for the SPAC similar to those of entities actually registered as corporations in the State of Delaware to deceive Plaintiff into believing that Newbridge was a legitimate, existing entity in the State of Delaware.

37. Defendant also signed the agreement purportedly on behalf of GCM, which, like Newbridge, is a fictional entity.

38. Specifically, at Schedule 1, Part 1 of the Agreement, the entity is described as "Goldenbridge Capital Management LLC", with "Company Number: 86-2880352", and "Place of Incorporation: Delaware State". *See* Ex. 1 at p. 11.

39. However, Plaintiff later learned that there is no "Goldenbridge Capital Management LLC" with that company number in the State of Delaware.

40. Upon information and belief, Defendant is not currently and was never affiliated with GCM or the entity by the same name that *is* incorporated in the State of Delaware, File No. 5680313.

41. Amendment No. 1 to the Form 10-K/A filed by Futuretech II Acquisition Corp., SEC[3] file number: 001-41289, details that Defendant was the "Chief Operating Officer of Goldenbridge Acquisition Limited", which upon information and belief is a SPAC domiciled in the British Virgin Islands, "from August 2020 until it completed business combination [sic] with Sun Car Technology Company in May 2023".

42. The Form S-1 filed by Goldenbridge Acquisition Limited with the SEC, under the heading "Our Management Team", also describes Defendant as "our Chief Operating Officer", and describes Defendant as "hav[ing] experience with initial public offerings and business combinations for blank check companies." SPACs are a type of blank check company.

43. Defendant, who prepared the Agreement, used GCM, a fictional entity that had a similar name to one he was actually associated with, to give a varnish of legitimacy to a transaction that was, in reality, a sham designed by Defendant for the exclusive purpose of personally enriching Defendant by separating Plaintiff from her Payment of $350,000.00.

44. The Agreement also lists "Seller's Lawyers" as "Loeb & Loeb LLP of 345 Park Avenue, New York, NY 10154." *See* Ex. 1 at p. 3. Loeb & Loeb is a well-known New York City-based law firm.

45. Upon information and belief, Loeb & Loeb LLP has represented Defendant and/or Defendant's other entities, and it is presently unknown whether they assisted and/or conspired with Defendant in connection with this particular fraudulent transaction.

---

[3] The United States Securities and Exchange Commission (the "SEC").

46. Defendant's identification of Loeb & Loeb LLP in the Agreement as "Seller's Lawyers" was designed to lend further credibility to an otherwise fraudulent transaction.

**Plaintiff Makes the Payment of $350,000.00 to Defendant**

47. Unfortunately, Defendant's fraudulent scam was successful inasmuch as Plaintiff made the Payment to Defendant, and Defendant received, retained, and benefitted from those funds.

48. Specifically, after Plaintiff and Defendant signed the Agreement, and on or about April 23, 2021, Plaintiff made the Payment of $350,000.00 to "Seller's Account" as defined in Section 1.1 of the Agreement. *See* Ex. 1 at p. 3.

49. Plaintiff has since learned that the bank account to which the Payment was made didn't belong to GCM, but instead was owned and/or controlled exclusively by Defendant.

**Defendant Ignores Plaintiff's Repeated Demands for Information, Acknowledging Only that the Payment Was Not Invested in Newbridge as set forth in the Agreement**

50. In the weeks and months after making the Payment, Plaintiff grew suspicious as Defendant repeatedly gave shifting excuses and purported reasons for not fulfilling his obligations pursuant to the Agreement including, most crucially, providing Plaintiff with evidence that she was actually transferred the shares of Newbridge she purportedly purchased as set forth in the Agreement.

51. For example, despite Plaintiff's repeated demands both directly and through counsel, Defendant failed and refused to deliver the documents set forth in "Schedule 2, Part 1" of the Agreement and as required by section 4.2 of the Agreement. *See* Ex. 1 at pp. 5, 12.

52. Defendant also failed to refused to provide Plaintiff with the "certified electronic copy of such updated register of members of the Company" as required by section 4.3 of the Agreement. *See* Ex. 1 at p. 5.

53. Additionally, pursuant to the Agreement, the Payment was to be "refundable to [Plaintiff] within 14 business days of Completion if Ant Group or its affiliate does not participate by depositing or paying at least USD 6,000,000 for the purpose of investing in the SPAC [] project covered by this Agreement to be undertaken by GCM". *See* Ex. 1 at p. 3. Upon the occurrence of this funding event, Defendant were required to "promptly share the confirmation of Ant Group's deposit" or otherwise "show proof of funds deposit without showing the depositor's identity". *See id.* at p. 3.

54. Defendant never provided Plaintiff with any evidence of the Ant Group's purported forthcoming investment in the SPAC as required by the Agreement.

55. Despite Plaintiff's multiple demands both directly to Defendant and through counsel, Defendant has failed and refused to provide Plaintiff with any evidence that her Payment was actually invested, including as required by the Agreement.

56. Not only has Defendant outright refused to provide Plaintiff with any documentation of the whereabouts of either her Payment or purported "investment" as set forth in the Agreement, but he has also ignored Plaintiff's alternative demands for a refund of the Payment in full, plus applicable interest.

57. In fact, on or about February 20, 2026 Defendant's counsel, Giovanni Caruso, Esq. of Loeb & Loeb LLP, represented to Plaintiff's counsel, Dan Brecher, Esq. of Scarinci Hollenbeck, LLC, that Plaintiff's investment was not actually made in Newbridge as required by the Agreement, but rather another company. Mr. Caruso did not provide Mr. Brecher with any further details regarding the whereabouts of Plaintiff's Payment or any further details.

58. Defendant's repeated dodging of his obligations to Plaintiff pursuant to the Agreement is further confirmation that Plaintiff's money went straight to Defendant's pocket.

59. Defendant never intended to and never did use Plaintiff's Payment for the "investment" purposes as set forth in the Agreement, as the entire Agreement was a sham from the beginning.

60. As a result of the foregoing, Plaintiff has brought this action to recover the $350,000.00 Payment from Defendant, which Defendant obtained solely through his fraud and deceit.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Fraud)**

61. Plaintiff repeats and realleges all of the preceding paragraphs as if set forth herein at length.

62. In order to induce Plaintiff into entering into the sham Agreement, Defendant knowingly made a series of material misrepresentations of present fact to Plaintiff.

63. On March 6, 2021, Defendant texted Plaintiff that a SPAC he was involved in, later identified as Newbridge, was very profitable and was expected to have an IPO within six (6) months.

64. Also in the March 6, 2021 text exchange, Defendant told Plaintiff that, if she wanted to invest, she would get her initial investment back plus 50% profit in a year and a half.

65. In the sham Agreement, Defendant also misrepresented that he was a "Director/authorized signatory" of GCM (*see* Ex. 1 at p. 9), and was authorized to execute the sham Agreement on GCM's behalf.

66. By the Agreement and in his communications with Plaintiff extraneous to the Agreement, Defendant also misrepresented that GCM was an entity that existed and was selling shares in Newbridge to Plaintiff.

67. By the Agreement and in his communications with Plaintiff extraneous to the

Agreement, Defendant further misrepresented that Newbridge was an existent SPAC, when in fact Newbridge never existed.

68. Defendant also exchanged a litany of emails with Plaintiff between March 30, 2021 up until the Agreement was signed on April 21, 2021, in which Defendant repeated the statements regarding, among other things the character of the SPAC and the SPAC's existence, the Ant Group's involvement, and other details regarding the purported investment that Defendant fraudulently induced Plaintiff to make.

69. The sham Agreement contains a further misrepresentation by Defendant that the Ant Group would invest in Newbridge.

70. Defendant also misrepresented that the Payment was to be made by Plaintiff to GCM pursuant to the Agreement, when in reality the Payment was made to a bank account owned and/or controlled exclusively by Defendant.

71. Defendant further misrepresented the Agreement as a legitimate investment transaction to Plaintiff.

72. The above-referenced statements by Defendant to Plaintiff were false and Defendant knew them to be false when made.

73. The above-referenced statements were made by Defendant to Plaintiff in order to falsely and fraudulently induce Plaintiff to enter into the sham Agreement and to make the Payment to Defendant.

74. Plaintiff had reason to believe the foregoing statements made by Defendant were true as, among other things, Plaintiff had met Defendant at a social event and understood Defendant to be a film producer and experienced investor, including in SPACs, and Defendant was tied to apparently legitimate entities via SEC filings by those entities.

75. Plaintiff also had reason to believe that the foregoing statements made by Defendant were true as Defendant made a concerted effort to lend a legitimate veneer to the Agreement by using language and entity names that were similar or identical to the names of existent entities.

76. Plaintiff made the Payment pursuant to the sham Agreement believing the money was going to GCM, when in reality the payment was going straight to a bank account exclusively owned and/or controlled by Defendant.

77. Defendant did not provide Plaintiff with any consideration whatsoever in exchange for the Payment, which Defendant simply pocketed and used exclusively to enrich himself.

78. As a result of the foregoing, Plaintiff has been damaged in an amount to be fully determined at trial, but not less than $350,000.00, plus interest at the highest rate permitted by law.

## AS AND FOR A SECOND CAUSE OF ACTION
## (Unjust Enrichment)

79. Plaintiff repeats and realleges all of the preceding paragraphs as if set forth herein at length.

80. As stated above, Defendant materially misrepresented to Plaintiff that the Agreement was a legitimate investment transaction by which Plaintiff would pay $350,000.00 to purchase shares of Newbridge owned by GCM.

81. In connection therewith, Plaintiff paid Defendant a total sum of $350,000.00 on or about April 23, 2021.

82. Defendant benefitted from the foregoing Payment given to him by Plaintiff, and Plaintiff did not receive a concurrent benefit from Defendant in return therefor.

83. It would be inequitable for Defendant to enjoy the benefit of the foregoing Payment that was provided to him by Plaintiff without any consideration therefor.

84. As a result of the foregoing, Plaintiff has been damaged in an amount to be fully determined at trial, but not less than $350,000.00, plus interest at the highest rate permitted by law.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Conversion)**

85. Plaintiff repeats and realleges all of the preceding paragraphs as if set forth herein at length.

86. Plaintiff was entitled to the use of the Payment for her own purposes.

87. By his acts as detailed herein, Defendant has, without authorization, intentionally interfered with Plaintiff's rights to the specific res of monies – the Payment – contained in her bank account to the exclusion of Plaintiff.

88. Defendant has exercised dominion, control, and possession over the monies belonging to Plaintiff that were contained in Plaintiff's bank account to the exclusion of Plaintiff.

89. As a result of the foregoing, Plaintiff has sustained damages in an amount to be fully determined at trial, but not less than $350,000.00, plus interest at the highest rate permitted by law.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Breach of Contract – In the Alternative)**

90. Plaintiff repeats and realleges all of the preceding paragraphs as if set forth herein at length.

91. The Agreement was a sham and a fraudulent contrivance entirely from the mind of Defendant with no legitimate basis in fact or reality, aside from Defendant's very real theft of the $350,000.00 Payment from Plaintiff.

92. However, to the extent the Court or a finder of fact determines that the Agreement formed a valid and binding contract between Plaintiff and Defendant, Defendant is personally

liable to Plaintiff for his breaches of the Contract as neither GCM nor Newbridge exist and Defendant was never associated and/or affiliated with either entity.

93. Should the Court or a finder of fact determine that the Agreement formed a valid and binding contract between Plaintiff and Defendant, Defendant is also personally liable to Plaintiff pursuant to the Agreement as Plaintiff made the Payment to a bank account exclusively controlled and/or owned by Defendant.

94. Plaintiff fully performed her obligations pursuant to the Agreement by, *inter alia*, making the $350,000.00 Payment to the bank account specified in the Agreement purportedly belonging to GCM, but which Plaintiff later discovered is exclusively owned and/or controlled by Defendant.

95. Specifically, despite Plaintiff's repeated demands both directly and through counsel, Defendant failed and refused to deliver the documents set forth in "Schedule 2, Part 1" of the Agreement and as required by section 4.2 of the Agreement. *See* Ex. 1 at pp. 5, 12.

96. Defendant also failed to refused to provide Plaintiff with the "certified electronic copy of such updated register of members of the Company" as required by section 4.3 of the Agreement. *See* Ex. 1 at p. 5.

97. Additionally, pursuant to the Agreement, the Payment was to be "refundable to [Plaintiff] within 14 business days of Completion if Ant Group or its affiliate does not participate by depositing or paying at least USD 6,000,000 for the purpose of investing in the SPAC [] project covered by this Agreement to be undertaken by GCM". *See* Ex. 1 at p. 3. Upon the occurrence of this funding event, Defendant were required to "promptly share the confirmation of Ant Group's deposit" or otherwise "show proof of funds deposit without showing the depositor's identity". *See id.* at p. 3.

98. However, Defendant never provided Plaintiff with any evidence of the Ant Group's purported forthcoming investment in the SPAC as required by the Agreement.

99. Defendant also failed and refused to refund the Payment to Plaintiff, despite the complete lack of evidence of the Ant Group funding event as set forth on page 3 of the Agreement. *See* Ex. 1 at p. 3.

100. Despite Plaintiff's multiple demands both directly to Defendant and through counsel, Defendant has failed and refused to provide Plaintiff with either evidence that her Payment was actually invested, including as required by the Agreement.

101. Not only has Defendant outright refused to provide Plaintiff with any documentation of the whereabouts of either her Payment or purported "investment" as set forth in the Agreement, but he has also ignored Plaintiff's alternative demands for a refund of the Payment in full, plus applicable interest.

102. In fact, on or about February 20, 2026 Defendant's counsel represented to Plaintiff's counsel that Plaintiff's investment was not actually made in Newbridge as required by the Agreement, and instead was purportedly invested in a separate company.

103. Defendant has damaged Plaintiff by virtue of his breaches of the Agreement as set forth hereinabove by, *inter alia*, retaining the Payment and providing Plaintiff with none of the bargained-for benefits and consideration set forth in the Agreement to which Plaintiff was entitled.

104. As a result of the foregoing, Plaintiff has been damaged in an amount to be fully determined at trial, but not less than $350,000.00, plus interest at the highest rate permitted by law.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing – In the Alternative)**

105. Plaintiff repeats and realleges all of the preceding paragraphs as if set forth herein at length.

106. The Agreement was a sham and a fraudulent contrivance entirely from the mind of Defendant with no legitimate basis in fact or reality, aside from Defendant's very real theft of the $350,000.00 Payment from Plaintiff.

107. However, to the extent the Court or a finder of fact determines that the Agreement formed a valid and binding contract between Plaintiff and Defendant, by his intentional actions and omissions as set forth hereinabove Defendant also breached the implied good covenant of good faith and fair dealing implied in the Agreement, and has deprived Plaintiff of the benefits of the Agreement to which she was entitled.

108. In particular, despite Plaintiff's repeated demands, both directly and through counsel, Defendant has failed and refused to provide Plaintiff with any details regarding her purported "investment" as set forth in the Agreement, including but not limited to the requested details regarding Newbridge and GCM, any information regarding the whereabouts of her supposed shares in Newbridge (or the entity that Defendant's attorney stated the Payment had been "invested" in) and, most importantly, the whereabouts of the Payment that was made by Plaintiff to Defendant on April 23, 2021.

109. In fact, aside from occasional replies amounting to a shifting narrative with scant detail, Defendant has entirely failed and refused to provide any legitimate, concrete details regarding the supposed transaction set forth in the Agreement.

110. Defendant's failure to do so is almost certainly because he is attempting to shirk his responsibilities to Plaintiff pursuant to the Contract, and to steal or otherwise wrongfully retain the Payment paid by Plaintiff to Defendant.

111. Due to Defendant's intentional acts and/or omissions as detailed hereinabove, including but not limited to his breach of the implied covenant of good faith and fair dealing,

Plaintiff has been left with no shares or other interest in any entity, whether in Newbridge or otherwise.

112. Defendant has accordingly wholly deprived Plaintiff of the bargained-for benefits and consideration to which she was entitled to pursuant to the Agreement, thereby damaging Plaintiff.

113. As a result of the foregoing, Plaintiff has been damaged in an amount to be fully determined at trial, but not less than $350,000.00, plus interest at the highest rate permitted by law.

114. Plaintiff demands a trial by jury of all issues so triable.

**WHEREFORE**, Plaintiff Jianjia Xie respectfully demands judgment in her favor and against Defendant Ray Chen a/k/a Raymond Chen as follows:

(1) on the first cause of action, for judgment in favor of Plaintiff Jianjia Xie against Defendant Ray Chen a/k/a Raymond Chen in an amount to be fully determined at trial, but not less than $350,000.00, plus interest at the highest rate permitted by law;

(2) on the second cause of action, for judgment in favor of Plaintiff Jianjia Xie against Defendant Ray Chen a/k/a Raymond Chen in an amount to be fully determined at trial, but not less than $350,000.00, plus interest at the highest rate permitted by law;

(3) on the third cause of action, for judgment in favor of Plaintiff Jianjia Xie against Defendant Ray Chen a/k/a Raymond Chen in an amount to be fully determined at trial, but not less than $350,000.00, plus interest at the highest rate permitted by law;

(4) on the fourth cause of action, for judgment in favor of Plaintiff Jianjia Xie against Defendant Ray Chen a/k/a Raymond Chen in an amount to be fully determined at trial, but not less than $350,000.00, plus interest at the highest rate permitted by law;

(5) on the fifth cause of action, for judgment in favor of Plaintiff Jianjia Xie against

Defendant Ray Chen a/k/a Raymond Chen in an amount to be fully determined at trial, but not less than $350,000.00, plus interest at the highest rate permitted by law;

(6) for the attorneys' fees and costs incurred by Plaintiff in connection with the instant matter; and

(7) for such other and further relief as this Court deems just and proper.

Dated: East Meadow, NY
November 24, 2026

CERTILMAN BALIN ADLER & HYMAN, LLP

By: ______/s/Joshua Feldman___________________

Joshua Feldman
*Attorneys for Plaintiff*
90 Merrick Avenue, 9th Floor
East Meadow, NY 11554
(516) 296-7000
jfeldman@certilmanbalin.com